May it please the Court, my name is Carrie McConaghy-Harris from the Law Offices of David Michael Cantor in Tempe, Arizona, and I represent Mr. Gentry Deel. I would like to start off today first by clarifying the facts, in particular involving Issue No. 2 in this case, which is the search of the vehicle resulting in finding the cartridge that was admitted into evidence at trial. In this particular case, I would like the Court especially to focus on the specific facts as cited in the brief. The government has responded asserting facts that are not necessarily supported by what was found by the trial court. And here the direct quote, and it's in the excerpts of record at H, that portion of those transcripts, the 1023 of 07 transcripts. I'm sorry, excerpts of record at what? It's at H in the volume 2 of the excerpts of record. And it is on page 248, the ruling of the trial court. And he specifically says that what he is finding is that it is reasonable to believe that officers would have looked inside the vehicle and that they could have potentially then seen the cartridge. You're talking about the inevitable discovery part of the ruling? The inevitable discovery. He tied both of them in as either inevitable discovery or plain view. Let's talk about the plain view part of this. Okay. I'll be honest with you. I didn't understand the inevitable discovery aspect of it. But the plain view, I did understand. Okay. Let's talk about the plain view. Okay. In this particular case. She – it was Judge McGee, was it not? Oh, yes. I apologize. She said that the officers were lawfully at the premises. Right. Is that true? The officers were lawfully at the premises of the house. And they looked into the window of the car? They did not. They did not look into the window? The officers were lawfully at the premises in order to search or to look – well, not even to search, but they were there because of the tire case, the stolen tires that were there. Right. And they saw a car there? They went in. They, at gunpoint, took the occupants out of the house. I'm not talking about that car. I'm talking about the car. Okay. The search of the house and the search of the car. I'm not talking about the house. Involved the same thing. Ma'am? I'm not talking about the house. They're outside where the car is parked. Right. And they said they looked into the windshield of the car. They did not. How did they see the bullet there? They saw the bullet during the unconstitutional search of the car that happened attendant to the tire.  They did not. They did not say it or they did not look through the window? They did not say they looked in the window. And they did not. Counsel, can you tell me what page of the judge's order this appears on? In that, let me see if I have it in here. I have the slides, Your Honor. It's throughout the lengthy transcript where the officer's testimony came in. No, no, the judge's order. Oh, 248, Your Honor. Do you know what page of the order that is? Oh, I'm sorry. It's on, it's document 122 in the CR, but it's page 248 of the actual transcript itself, Your Honor. So it stays the same. All right. What page of the order? It was just in the transcript, the oral. I give up. Never mind. I'm sorry. Your Honor, there's two orders. There's the suppression and the illegal finding in the suppression order itself. Yes. And then there's the later raising of the cartridge coming in, which was just done at an evidentiary hearing immediately prior to trial. And there's the oral pronouncement of the trial court regarding what it was finding. You're talking about the oral pronouncement? Oral. Yes, Your Honor. Okay. And, Your Honor, that's why I want to make clear. It was not any testimony by the officers that they were ever looking in the window of the vehicle. The vehicle was searched and it was opened up. The casing was found during the illegal search that occurred attendant to the tire case. Later, when Tom Farrell came in, matched up the car parts to the vehicle, and then he said at the hearing to bring in the cartridge because all the gun evidence had been kept out because it was an unconstitutional search of the house and the vehicle. But when they said, well, we would have looked in there, it was I would have looked. If I hadn't done it with what I thought was a consent search or attendant to something else, I would have looked in. That's what the testimony was, Your Honors. And that was not considering, or the trial court had to recognize, but they didn't have any pictures, they didn't have any idea what the actual view inside the car would have been had they done that, because it also has those tinted windows. The only photo of the bullet casing is taken from inside the vehicle when they had done what was found to be the illegal unconstitutional search. And where was the cartridge? I'm sorry? And where in the car was the cartridge? It was found in, shoved down into the seat belt area where the seat belt was so that the top of it was sticking out. You can see the shiny item is what the court voted. There are at least four seat belts. Four seat belts, where it kind of goes down into the seat, Your Honor. In the middle and in the back. There are at least four seat belts in cars. Yes, Your Honor. Usually there are five or six. Yes, Your Honor. So we're going to start with driver's seat belt, front passenger, rear left passenger, rear middle passenger. Back passenger in the middle, Your Honor. So it was essentially in the back seat. Yes. Tucked in. Down in the hole where the seat belt goes, the top sticking up, but it's a shiny item that the court found was the cartridge. The point is you can't tell necessarily it's the cartridge at that time. And, Your Honor, is also in But we have a finding on that. Sure. The officer, this is Ferrell? Yes. Testifies at page 235 of the transcript that he, had he not gotten consent, he would have looked in the vehicle. Right. And then we have a finding from the district judge that, had he done so, he would have seen the cartridge. And, Your Honor, again, I believe that that is not, well, there's two things. First of all, it is a factual finding, so I recognize that the deference that you give the trial court is much higher on that. I don't believe it is a reasonable fact finding at all. I think it clearly is error for the trial court to have found that, given that the only representation of how you can see that that we have is what was done from the perspective of the illegal search. Inside the vehicle, doors open. These are doors that have dark tinted windows on them. If they had been closed, we're assuming if the officers had walked by and looked in, they would have had to peer in with their hands to try to get through the tinted windows, if they would have even noticed that that was a bullet casing. On top of that This is fine argument to the prior effect, but we have a factual finding. Okay. And I'm just having, you know, let's say I really wanted to reverse Judge McGee on this. Sure. I really wanted to reach that result. How would I do it? What would I say? Okay. She, and one, I mean, these were not, there's no evidence that they had opaque windows. No. I mean, that somehow they were not glass, they were, you know, I guess you can quote it. I don't know how visible something is in the backseat if you look through tinted windows or how heavily tinted they are or anything of that sort. Why isn't this the kind of thing that we have to defer to the trial of fact? Sure. Your Honor, and I will, in order for time's sake to get past it, I will say I don't  I don't have any evidence that they were tinted windows. I still disagree about the facts. But moving on to the legal analysis of it, the legal part of it for the plain view, it needs to be something that is readily apparent, that that is clearly evidence of a crime. Having a bullet casing in the back of your vehicle is not. That does not meet what the plain view legally needs to have to establish that second part of that test. You don't take it by itself. It's not like they're going around, what was this, Tempe or Phoenix or wherever the car was. And they're going by parked cars, looking in and looking for anything a little suspicious. Say, aha, there's a cartridge. I would guess there are people in Arizona who might have cartridges in the back of the car. They've gone hunting. It wouldn't be that unusual. But this is a car that was identified or that looked like a car that was identified as having been at the shooting. They had external evidence of damage to the car that matched debris. So the thing is, focusing on this car was differentiated from other cars, at which point, I guess I don't find it unreasonable to think that an officer, if he didn't think he could go in, would take a very close look, would look under the car, would peer in. I mean, it just doesn't strike me as – in fact, it strikes me as the kind of thing police would in fact do. Sure. And, Your Honor, I would distinguish that by pointing out that it seems to be confusing probable cause with the ability to get into that car and actually search it, which they do not have. May I ask you about this testimony 242 and 243? Yes, Your Honor. It says, Did you ever look through the window of the car into the backseat? Yes. Before you secured the evidence, when I first – yeah, before I took the photos, I looked into the vehicle. Right. And did you look into the backseat and did you actually see the cartridge before you opened the door? Yes, I did. Through the window? Yes. Do you have a distinct memory of doing that? Yes, I did. What else did you see in the backseat? Just this, the cartridge. There was nothing on the floor. Doesn't that – isn't that testimony that he looked into the window? He was not – the tinted glass did not interfere with his ability to see the cartridge in the backseat? Your Honor, that's testimony that he would have looked in there. No, no. No, no. That's not – that's not that he would have looked. Did you ever look through the window of the car into the backseat? Yes. Before you secured the window. When I first – yeah, I looked into the vehicle. And did you look into the backseat and did you actually see it before you opened the door? Yes, I did. Through the window? Yes. And, Your Honor, I would still just disagree that that was on the recross examination and he had prior said that was something theoretically he would have done. But it wasn't what was done in this case because the car had already been searched prior to that. Well, I don't, you know, know what – that's a different question, whether he did or didn't testify to it and whether you do or don't believe it, particularly in view of what he may have said earlier in his testimony. But he certainly did testify that he looked through those panes of glass and saw the the car and tailgate and looked through the window. And he made the correct decision. Well – and again, Your Honor, I would assert that that, regardless on the factual part of it, it still has to give them a basis to get inside of the car and just having the probable cause even if he had recognized that, yes, that's a bullet casing, I clearly could see it in there, it still isn't enough to get him inside the car without a warrant. That's clear in the law, Your Honors. And the plain view doctrine doesn't get him inside. Being on the premises can't get them into the vehicle. But the inevitable discovery does, because once he has that kind of evidence, he can get a warrant. Well, Your Honor, I would assert that he has to get the warrant. I mean, in any case where you have evidence, you can't just bypass the warrant requirement by saying, I would have been able to get a warrant. They have to get a warrant. But the way it works is he thinks he has consent, so he thinks he doesn't have to get a warrant. Why not hypothesize what would happen if he hadn't gotten consent? So he thought the consent was not proper. And what the inevitable discovery does is it presumes a different course of action, which would say, you know, he looks, he sees a cartridge, he says, well, I don't have consent, I better get a warrant. That's the chain of reasoning. Why would he need a warrant assuming he has probable cause to believe that the bullet is evidence of a crime? Okay? We'll start with that assumption. Assuming he has probable cause to believe the bullet is evidence of a crime, why would he need a warrant since we're talking about a search of a vehicle? Well, because a vehicle, you still have that legitimate expectation of privacy. Yeah, but there's a car exception to the warrant requirement. This, the defendant was already in custody, which, I mean, you know, especially now with the Gantt case, that's not. No, we're not talking about a search. We're not talking about a search incident to an arrest. I'm talking about probable cause to believe that evidence is in the car. And the car isn't going anywhere, Your Honor. That's true, but there's a car exception. And, but the car exception is what? Is that you, it's an exception to the warrant requirement. It's not an exception to the probable cause requirement. It's an exception to the warrant requirement, isn't it? Only if there's some specific circumstance that gives you the exception. Again. What are you talking about? The car isn't going anywhere on its own. If it's a car, you don't need a warrant if there's probable cause. Isn't that the rule? No. If it's a car, you still need to have some type of exigent circumstance to get you inside the car. You can't just search any car. So you don't think there's a car exception to the warrant requirement? No, Your Honor. In light of the law as it stands now, they still need a warrant to get into that car. Okay. Thank you. Where was the car parked? I'm sorry. Where was the car parked? Was it on the street? Was it off the street? It was off the street in the private, I don't even know if it would be called a driveway, but in the private yard. And, in fact, it wasn't the defendant's vehicle. It was his mother's vehicle. Which is why the officers only removed the tires from it, put the other tires back on, because they were not going to take the car. They were not going to inventory it. They were not going to take it down and impound it. They were going to leave it for her there because it was her only source of vehicle. Okay. Thank you. Thank you. We'll hear from the government. May it please the Court. My name is Roger Dock and I represent the United States. I think a fair appraisal of the arguments made by counsel on brief or the defendant on brief and the government's response is largely related to a different view of the record below. Well, the record does suggest the officer first testifies he would have looked and he could have looked. And then the next time when he comes back he says he did look. It's, you know, hard to understand. Well, the reason for that is, of course, you're aware there was an illegal search of the house before that. And what we're trying to show to the district court is that was attenuated from the vehicle search. And they would have still done all of this stuff regardless of the house search. That has nothing to do with whether he first said I would have looked and then said I did look. It has nothing to do with the house. He was asked about the search of the car. And then they said to him the first time, well, what would you have done? He said, well, I would have looked through. Then I could have looked through. And then he comes back and they get him to say I did look. Now, the district judge, I guess, made a finding that he believed him the second time, not the first time. And it may be difficult to upset the finding, but it's a little disturbing to read evidence like that. Well, as I said, the reason why there was a two, trying to show they were separate, he would have looked regardless of whatever happened in the house. Because you have to realize what happened in the interim is they found the parts of the vehicle and they matched them, the parts of the vehicle they found near the crime scene, and they matched them underneath his car, held up the parts and found out, oh, my word, this is the same silver Malibu. And so at that point they knew. And, you know, after that he looked. And he also testified at trial in the supplemental excerpt of Record 87 and 88 that he did in fact look. And then the other one was the supplemental excerpt at pages 21 and 22 where he testified that he did look. Now, it seemed to come down in the discussion to the fact that he assumed he had a right to look, and he did look and he saw the bullet in the car on private property. Does he then have a right to go in and seize the bullet, or does he have to get a warrant? Well, first of all, there's they had the car properly seized. Nobody below, the defendant below did not maintain that they did not have the car properly seized. There was probable cause to search the car clearly once they had matched the pieces and they knew it was the shooter's vehicle. The district court didn't need to reach that decision because the officer testified, you know, he looked in, saw the bullet, and she made findings of why he would realize that it's relevant to this case. And so the court made a finding that it was found in plain view. Well, that doesn't answer the question. The question is, did he have the right to go into the car and take the bullet after he knew it was there, or did he need a warrant? No, he didn't need he did not need a warrant. There was probable cause to search the vehicle. Even if he hadn't seen the bullet? Pardon? Even if he hadn't seen the bullet? Yes, there would have been. However, that didn't happen. He saw the bullet and that's, I guess, a hypothetical. And then he had probable cause to search it without a warrant? That's correct. And what case is that? California v. Andrade, or excuse me, California v. Acevedo. You can search a vehicle without a warrant if you have probable cause. As I indicated, I don't believe the district court actually had to reach that conclusion, whether or not there was probable cause, because it found there was plain view. And we didn't use anything we found in the trunk. I thought that was only if the vehicle is on public highway. Pardon? I thought that the ability to search a vehicle without a warrant hinges on its being on a public highway, the theory being that it could be driven off to another location. Well, as I recall, it was in the driveway right next to the street, but that did not come up below, that they did not, when Officer Yellowhair saw what appeared to be the stolen vehicles, or the stolen wheels on the vehicle, and he went up and looked at them. And this was prior to any of the shooting stuff coming up. He was going back and forth between the two vehicles trying to match them, and it was right there, it was in the driveway right next to the street. Right, but the difference is tires are outside. You don't need to get in the car. They can be seen by anybody who sees the car. And, of course, you would need a warrant for that because it's there in plain view. But that doesn't answer the question of whether or not you can search a vehicle without a warrant if it's not on a public highway. Well, it was still a mobile vehicle, and, well, of course, it had stolen tires on it. It still could be moved. The defendant was in custody, but his family wasn't, his mother wasn't. It was actually her car. Any of his relatives weren't. It could have still been moved. And, at any case, we had plain view when we had that. Anything can be moved. You know, evidence can be moved. All sorts of stuff can be moved. And here we have a warrant of crime of absent and exigency. Well, things can move. But does it really matter in this case whether they need a warrant or not? No, because they had plain view. They were on the outside having the wheels changed. And by the time that was all done and they're doing their paperwork, see, the problem is this is not like a regular city where I would guess a police department would tow it to the police department or their evidence place and do whatever it is that they do and inventory it and all of that. There's no place to tow it, so they just did it right there. They're doing all of the paperwork at the scene. Well, they're still in the process. I think they had already just changed the wheels and they're still doing whatever the patrol officer is doing with regard to that tribal offense. Did they change the tires? Did they do some oil change, too, and make sure it's? Well, they actually had. They're accommodating, I thought. They really had no choice but to give everybody their vehicles back. This is out in the middle of no place. Oh, I'm sorry. I mean, it seemed very considerate of the mother for them not to take her car away. It did seem very considerate. I'm not sure that all police departments would be equally considerate. Well, I think that you'll find that Indian police departments in remote areas have no choice. Well, whether they have a choice or not, it's nevertheless commendable that they're concerned enough to do that. Okay, anything further? No, thank you. Thank you. Okay. Would you like to take a minute for rebuttal? Would you like me to add anything? Please. Your Honor, I would just briefly like to point out that, yes, it was not on the public property. It was on the private property. And that doesn't make a difference. But it really doesn't matter, does it? Because if we want to speak about inevitable discovery in plain view, we have to hypothesize a course of action that didn't happen. And we can just as well hypothesize that they would have just gone in because they didn't need a warrant, and that would have been okay. Or we can hypothesize that they said, oh, no, we need a warrant. We'll get a warrant and go in. So, you know, since we're hypothesizing, we can hypothesize either course. So does it really matter whether they need a warrant or not? It does, Your Honor, because here, unlike most other cases I've seen, we're hypothesizing things that clearly would not have happened. For example, the changing of the tires had already occurred, and that's at 241. The officer admits that, yes. What do you mean it would not have occurred? Let's say they look in, as he says he looks in. He sees a cartridge, and all of a sudden he gets a revelation. Wait a minute, I can't go in because the consent by God is no good, and I think I need a warrant. You think he wouldn't have bothered to get a warrant? Well, I think he should have gotten a warrant. But the inevitable discovery doctrine applies when they clearly didn't bother to do that. So, I mean, it puts it in just a position that it never would have happened the way they're now trying to hypothesize it might have happened. And here, especially in light of the earlier testimony. Why would that not have happened that way? Because the officer said they had already changed out the tires. It was done. There was also an admission that there was no probable cause on the shooting case at the time that that happened, the search. So to say that there was probable cause now, again, we can hypothesize that doesn't make it so that it really would have inevitably been discovered. At the time they go into the car, at that point, suddenly they get a revelation. They say, no, wait a minute. We can't go in. The consent is no good. We need a warrant. Why? What's implausible about thinking they would say, okay, we'll go get a warrant and be back? Well, the problem is that we have the Fourth Amendment that requires that they do that. So they need to do it rather than hypothesize that maybe we would have under specific circumstances, but we didn't bother this time because it was the day after Thanksgiving and who wants to bother getting a warrant today? The Constitution still stands in their way. Isn't the inevitable discovery always that kind of situation where they should have done something and they didn't do it? We say, well, you never know what's going to happen anyway because you were on a car. But the inevitable discovery is they really, at least normally, it appears that they really would have done something. Here, the testimony is clear that they weren't moving in that direction. They had already changed out the tires, Your Honor. Okay. It was done. Thank you. Thank you for your time. Page SRU, stand submitted.
judges: Kozinski, Reinhardt, Silverman